IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

ROBERTO DE LUCIA,                        *

        Petitioner,                      *

vs.                                      *
                                                    CASE NO. 3:19-CV-7 (CDL)
RACHEL MARINA CASTILLO, PEDRO    *
CASTILLO, and MARINA CASTILLO,
                                         *
        Respondents.                     *

_____      *

O R D E R

This action arises under the Hague Convention on the Civil

Aspects of International Child Abduction ("Convention"), Oct.

25, 1980, T.I.A.S. No. 11670, and its implementing legislation,

the International Child Abduction Remedies Act ("ICARA"),

22 U.S.C. § 9001, *et seq.* Roberto De Lucia, an Italian citizen,

filed a petition under the Convention seeking the return of his

children, R.T.D.L. and N.A.D.L., from the United States to

Italy. The children's mother, Respondent Rachel Marina

Castillo, is a citizen of Italy and Peru who moved with the

children from Italy to Georgia in March 2018.[1] Castillo opposes

the children's return. The Court received briefs from the

parties and held a hearing on the petition. For the reasons set

forth below, the Court grants De Lucia's petition.

_____

[1] Rachel Marina Castillo's parents, Pedro Castillo and Marina Castillo, were also named as Respondents. The primary dispute in this case, though, is between De Lucia and Rachel Marina Castillo, whom the Court refers to as "Castillo" in this Order.

FINDINGS OF FACT

The Court makes the following findings of fact based on the testimony and exhibits presented at the April 8, 2019 hearing.

## I.  Family History

De Lucia and Castillo began a relationship in Italy in 2010, although they never married.  They have two children: R.T.D.L., who was born in November 2012, and N.A.D.L., who was born in August 2014 ("Children").  Both Children were born in Monza, Italy, and their birth certificates list De Lucia as their father.  The Children lived with De Lucia and Castillo in Castillo's apartment in Cusano Milanino, Italy, along with Castillo's daughter from a previous relationship, A.M.A. R.T.D.L. attended nursery school and then kindergarten in Cusano Milanino, and N.A.D.L. attended nursery school there.  De Lucia works as an administrative employee at a local university, and he earns a salary that is sufficient to provide for himself and the Children.

## II.  The Green Cards and Visits to the United States

Castillo's parents are United States citizens, and De Lucia and Castillo agreed to obtain permanent resident status ("green cards") for the Children so that they could visit their grandparents easily and ultimately pursue higher education in the United States.  When De Lucia agreed to obtain the green cards for the Children, he knew they would have to be present in

the United States for some part of each year to maintain the green cards, but he did not agree for them to move to the United States. He believed that the Children would continue to live in Italy until they were old enough to attend college. Each summer, Castillo, A.M.A., and the Children spent approximately two months with Castillo's parents in Athens, Georgia, then returned to Italy for school.

## III. The Separation

De Lucia and Castillo separated in December 2016. De Lucia moved out of Castillo's apartment and into his parents' house nearby. After De Lucia and Castillo separated, De Lucia and Castillo shared unsupervised custody of the Children, and the Children lived with De Lucia at his parents' house for part of each week. De Lucia and Castillo did not have a formal, court-ordered custody arrangement.

In 2017, Castillo, A.M.A., and the Children visited Castillo's parents for the summer. In September 2017, Castillo and the Children returned to Italy, but A.M.A. did not. De Lucia told Castillo that he did not want the Children to keep their green cards and that he would not permit the renewal of their passports. In January 2018, Castillo retained a family law attorney to propose a formal custody arrangement. She did not, at that time, take any action to have De Lucia's custody rights altered or terminated. Although De Lucia and Castillo

agreed on many points regarding custody and support, De Lucia wanted to require that the Children's green cards be revoked, and Castillo would not agree to that condition.

## IV. Accusations Against De Lucia

After De Lucia told Castillo in September 2017 that he did not want the Children to keep their green cards and that he would not permit the renewal of their passports, Castillo filed two police reports against De Lucia. Castillo reported that De Lucia had aggressive and violent attitudes: De Lucia forcefully threw a plate against a wall near her in June 2010; De Lucia broke her personal computer in 2011; De Lucia threw a pair of glasses, injuring A.M.A., in 2011; De Lucia struck Castillo in the face in the summer of 2012; and De Lucia had a violent outburst in December 2016, which Castillo had to flee and take shelter in a bakery. Pet'r's Hr'g Ex. 40, Criminal Complaint (Oct. 18, 2017), ECF No. 31-1 at 307-308. Castillo also reported that R.T.D.L. engaged in exhibitionist behavior during a bath and told Castillo it was "daddy's game" and that R.T.D.L. told Castillo that she slept without underwear at her father's house on one occasion. *Id.* at 308. The officer scheduled an appointment for Castillo with Social Services so that Castillo's report could be investigated, *id.*, but Castillo did not appear for the appointment. *Id.* at 310.

In November 2017, Castillo returned to the police, accompanied by her attorney, Stefano Benvenuto. She reported that De Lucia raped her in January 2012; that he beat her and put his hands around her neck in May 2012 when she was pregnant with R.T.D.L.; that De Lucia sent her "an endless series" of threatening messages every day; and that when she was in a parking lot to make arrangements for the Children in October 2017, De Lucia pushed her and shut the car door on her finger. Pet'r's Hr'g Ex. 41, Criminal Complaint (Nov. 4, 2017), ECF No. 31-1 at 314-315.

At the hearing, Castillo testified that De Lucia lost control and became physically violent with her, grabbing her by the neck once while she was holding one of the Children and pushing or hitting her on several other occasions, sometimes in front of the Children. Castillo also testified that De Lucia told her several times that he would kill her. Monica Lucero, who lives in the same apartment building as Castillo in Cusano Milanino, testified at the hearing that she often heard noises and screaming coming from Castillo's apartment and that on one occasion she saw bruises on Castillo's neck and arms that Castillo attributed to De Lucia. Lucero did not remember when it happened, but she believes that it was in 2016 or 2017. Castillo testified that after De Lucia moved out of her apartment in December 2016, De Lucia did not hit her or put his

hands on her in an inappropriate way, although he did use threatening words often, at times in front of the Children. Castillo did not produce any of the threatening messages she reported to the police in November 2017.

A family therapist who has worked with Castillo and the Children since they came to Athens testified that R.T.D.L. told her that De Lucia yelled at her and hit her. Castillo, however, did not testify about any incidents of violence against the Children, and she did not present evidence that she reported any such incidents to the police. Castillo did testify that De Lucia sent her two WhatsApp messages containing photographs of the Children without clothes. One photo is of the Children playing on a bed and shows the unclothed buttocks of one child. At the time, Castillo responded with a frowny face emoji and then carried on the chat with De Lucia, exchanging a series of photos and messages with him. The other photo is of the Children taking a bath. At the time, Castillo responded with a smiley face emoji and said, "Good girls, take your bath." Pet'r's Hr'g Ex. 30, WhatsApp Message String (Mar. 19, 2018), ECF No. 31-1 at 241. Castillo also testified about R.T.D.L.'s exhibitionist behavior during a bath; R.D.T.L. told Castillo it was a "game of the father." Castillo told the Children not to play like that.

The Court interviewed the Children in chambers with only the court reporter and A.M.A., the Children's older half-sister, present. Due to their shyness and young age, the Children did not share anything that the Court found significant.

## V.  The Removal of the Children

Between March 21 and March 23, 2018, De Lucia and Castillo communicated about who would keep the Children while their school was closed for the upcoming Easter holiday.  Then, on March 23, 2018, without notification to De Lucia, Castillo took R.T.D.L. and N.A.D.L. to the United States.  Castillo told De Lucia in an email that she had gone to visit her parents in Athens, Georgia because her mother had health problems. Castillo said that she planned to return on April 4, 2018, and she told De Lucia that she would keep him posted and that he should call when he wanted to talk to the Children.  Shortly after that, Castillo told De Lucia via WhatsApp that she could not return to Italy right away but planned to return in the summer, and she invited him to come see the Children.  In response, De Lucia told Castillo to come back to Italy and that she did not have his consent to take the Children out of Italy. De Lucia later filed an accusation against Castillo for child abduction.[2]  At the hearing, De Lucia testified repeatedly that

---

[2] Based on the evidence presented at the hearing, the abduction charges are still pending.  Although Castillo could be prosecuted for abduction, De Lucia's family law expert, Carlo Rimini, testified that

he did not give consent for the Children to travel to the United States.  Castillo does not dispute that she and De Lucia had no agreement for the Children to live in the United States beginning in March 2018.

## VI.  The Italian Custody Proceeding

On March 30, 2018, Castillo's lawyers filed a custody and maintenance case against De Lucia in Italian civil court.  The petition states that Castillo and the Children live in Cusano Milanino.  In the petition, Castillo requested sole custody of the Children and child support, but she also asked that De Lucia receive visitation, with the Children staying with him on alternating weekends and certain weekdays.  Castillo did not appear for any of the scheduled hearings.  In October 2018, Castillo's lawyer confirmed that Castillo did not intend to return to Italy with the Children, and on October 23, 2018, the Italian Court granted De Lucia temporary sole custody of the Children until an additional hearing could be held.  That hearing is presently scheduled for June 12, 2019.

Neither Castillo nor the Children have returned to Italy since March 2018.  De Lucia has maintained contact with the Children, and he speaks to or video chats with them regularly. The parties agree that if the Children are returned to Italy, they would live with De Lucia and his parents at the parents'

<hr>

it is unlikely that Castillo would be detained on these charges if she returns the Children.

home, which is a loving environment. Italian Social Services met with De Lucia several times between February 2018 and September 2018, and Italian Social Services recommends a path to provide psychological and parenting support to De Lucia. Italian Social Services also recommends interviewing the Children and Castillo once they return to Italy. De Lucia's family law expert, Carlo Rimini, testified that the Italian judicial and social services systems are prepared to and capable of protecting the Children from a grave risk of harm if they are returned to Italy. Castillo's Italian lawyer, Stefano Benvenuto, does not dispute that the Italian courts' goal is to protect the best interests of the Children, but he does worry that the system has been slow in some cases.

## CONCLUSIONS OF LAW

Both Italy and the United States are signatories of the Convention. *See* Status Table: Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited Apr. 2, 2019). The two aims of the Convention are (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention art. 1. The Convention

requires signatory states to make available a remedy so that parents of children who have been wrongfully removed can bring proceedings to compel the return of their children. *See id.* arts. 7 & 12.

"Whether the Convention requires the return of the children to [Italy] or their continued residence in the United States presents a mixed question of law and fact." *Pfeiffer v. Bachotet*, 913 F.3d 1018, 1022 (11th Cir. 2019) (per curiam). The Convention and ICARA empower the courts "to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4). "Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." *Id.* § 9001(a)(4); *accord* Convention art. 12. Thus, the Court must determine whether R.T.D.L. and N.A.D.L. were "wrongfully removed." If they were, then the Court must determine whether any of the Convention's narrow exceptions to return apply.

## I. **Were the Children Wrongfully Removed from Italy?**

The removal of a child is wrongful if (1) "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention" and (2) "at the time of removal or retention those rights were actually

exercised . . . or would have been so exercised but for the removal or retention." Convention art. 3. "The rights of custody . . . may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." *Id.* "The party seeking the child's return must establish by a preponderance of the evidence that the child was wrongfully removed or retained." *Pfeiffer*, 913 F.3d at 1023. To do that, the petitioner must show "that (1) the child was a habitual resident of another country at the time she was removed to the United States; (2) the removal breached the petitioner's custody rights under the law of that other country; and (3) the petitioner was, in fact, exercising those custody rights when the child was removed." *Id.*

A.   Where Was the Children's Habitual Residence at the Time of Removal?

The first question for the Court is the children's State of habitual residence on March 23, 2018, the day Castillo removed them from Italy. Neither the Convention nor ICARA defines "habitual resident." *Id.* at 1024. The Eleventh Circuit "construe[s] the term's 'ordinary meaning as understood in the public law of nations.'" *Id.* (quoting *Santovincenzo v. Egan*, 284 U.S. 30, 40, (1931)). Citing the High Court of Justice in the United Kingdom, the Eleventh Circuit observed that "a habitual residence is established when 'the purpose of living

11

where one does has a sufficient degree of continuity to be properly described as settled.'" *Id.* at 1023-34 (quoting *In re Bates*, No. CA 122.89 at 9-10, High Court of Justice, Fam. Div'n Ct. Royal Court of Justice, United Kingdom (1989)).

In this case, De Lucia argues that the children's habitual residence as of March 23, 2018 was Italy, while Castillo contends that both Italy and the United States should be considered the Children's places of habitual residence. The Court concludes that a child can have only one habitual residence at a time. The Convention does not state or suggest that a child may have more than one habitual residence; rather, it states that an object of the Convention is to ensure the prompt return of children "to *the State* of their habitual residence" and that the first question in determining whether removal is wrongful is whether it breaches a person's custody rights "under the law of *the State* in which the child was habitually resident immediately before the removal or retention." Convention preamble & art. 3. And, most (if not all) U.S. courts share the view that a person has only one habitual residence at a time. *See, e.g.*, *Didon v. Castillo*, 838 F.3d 313, 316 (3d Cir. 2016) (noting that a child "may only have one habitual residence country at a time" and concluding that the children were habitually resident in Dutch Sint Marteen, where they lived, and not French Saint Martin, where they

attended school); *Panteleris v. Panteleris*, 601 F. App'x 345, 349, 351 (6th Cir. 2015) (stating that "a person can have only one habitual residence" and concluding the parents intended for their children to stay in the United States for just one year, not to relocate there); *Reyes v. Jeffcoat*, 548 F. App'x 887, 891 (4th Cir. 2013) (concluding that a child's habitual residence did not shift from the United States to Venezuela—even though he spent 45% of his time in the United States with his father and 55% of his time in Venezuela with his mother—because the evidence did not demonstrate a shared intent of the parents to relocate the child to Venezuela permanently); *Sorenson v. Sorenson*, 559 F.3d 871, 873 (8th Cir. 2009) (stating that "a person may have only one habitual residence" and concluding that the child's habitual residence was in Australia because the parents shared an intention for her to live there for an indefinite period of time and did not have a mutual shared intention to return to the United States).

The Eleventh Circuit has offered "insight into the meaning of 'habitual residency'" in "identifying when a child's habitual residence has been changed." *Pfeiffer*, 913 F.3d at 1024. The "two requirements to alter a child's habitual residence" are "(1) the [people entitled to fix the child's residence] must share a 'settled intention' to leave the old habitual residence behind; and (2) an 'actual change in geography and the passage

of a sufficient length of time for the child to have become acclimatized' must occur." *Id.* (quoting *Ruiz v. Tenorio*, 392 F.3d 1247, 1252-53 (11th Cir. 2004) (per curiam).

The Eleventh Circuit has staked out several guideposts for this analysis. First, in general, unless the child was relocated to the new country *before* the date of the challenged removal, there is no change in the child's habitual residence. *See id.* (concluding that children who had lived continuously in Switzerland for six years and had never spent significant time in the United States could not have acclimatized to the United States and were thus not habitual residents of the United States at the time of removal). Second, if the children *did* move to the new country before the date of the challenged removal or retention but the parents lacked a settled intent to abandon their children's prior habitual residence for a new one, the "courts should be hesitant to find a change in habitual residence unless the facts point 'unequivocally to a change,' or the court can confidently conclude that the child's attachments have changed such that returning them to the original forum would be extremely disruptive." *Chafin v. Chafin*, 742 F.3d 934, 938 (11th Cir. 2013) (per curiam) (quoting *Ruiz*, 392 F.3d at 1255) (concluding that there had been no change in the child's habitual residence because there was no shared settled intent of the parents to make such a change and it was not "unequivocally

clear" from the evidence that the child's habitual residence in Scotland had been abandoned simply because her mother brought her to the United States for a trial period); *accord Ruiz*, 392 F.3d at 1254 (concluding that the district court did not err in finding that the parents never had a shared intention to abandon the United States and make Mexico their children's place of habitual residence because the evidence showed that although the parents agreed to move to Mexico, it was only for a trial period; the mother never intended to move to Mexico permanently; and even the father's intention about the permanence of the move was ambiguous). Finally, "the intent to change the habitual residence of a child from one country to another can be" conditional, including "conditioned on the ability of one parent . . . to live in the new country with the child." *Calixto v. Lesmes*, 909 F.3d 1079, 1091 (11th Cir. 2018) (remanding for factual findings on whether the parents had a shared *and unconditional* intent for the child to move from Colombia to the U.S. or whether their intent was conditional on the father's ability to join the mother and child in the U.S.).

Based on these principles, the Court cannot find that the United States was the habitual residence of R.T.D.L. and N.A.D.L. on the date of removal, March 23, 2018. The evidence does not demonstrate a shared and settled intention of De Lucia and Castillo to abandon entirely the Children's habitual

residence in Italy and change it to the United States. De Lucia testified that he never consented for the Children to move to the United States. He further testified that he only facilitated green card applications for the Children so that they could attend an American university in the future. According to De Lucia, he and Castillo agreed that the Children would always come back to Italy after each summer vacation in the United States, and they did. Castillo did not seriously dispute this characterization of the agreement. She testified that she intended to spend all summers in the United States with the Children. She also testified that when she and the Children first got their green cards, spending summers in the United States sufficed to maintain permanent legal resident status, although she became concerned that the policies of the United States might change. At most, the evidence shows that De Lucia and Castillo shared a settled intention for the children to live in the United States each summer but live in Italy for the rest of the year. And, regardless of Castillo's intentions with regard to maintaining the green cards, it is clear to the Court that De Lucia did not share those intentions.

Castillo argues that even if the Children can only have one habitual residence at a time, they had alternating habitual residences such that both Italy and the United States should be considered the Children's places of habitual residence. She

relies on two Ninth Circuit cases in support of this argument, but neither supports finding that the United States was the Children's place of habitual residence on the date of removal under the facts of this action. In the first case, *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), the Ninth Circuit recognized that "many courts" hold the view "that a person can only have one habitual residence at a time under the Convention." *Id.* at 1075 n.17. The Ninth Circuit noted, in dicta, that "[t]he exception would be the rare situation where someone consistently splits time more or less evenly between two locations, so as to retain alternating habitual residences in each." *Id.*; *see also id.* at 1083 n.50 (suggesting in dicta that a child might acquire "dual habitual residences" by spending regularly alternating periods with each parent). But, "alternating habitual residence" did not apply in *Mozes*, where the children had moved to the United States from Israel with both parents. Rather, the question in *Mozes* was whether the parents shared a settled intent for the United States to supplant Israel "as the locus of the children's family and social development." *Id.* at 1084. The Ninth Circuit remanded for further findings of fact on this issue. *Id.*

The second "alternating habitual residence" case is *Valenzuela v. Michel*, 736 F.3d 1173 (9th Cir. 2013). In that case, the Ninth Circuit stated that there must be "a shared

intent to abandon the prior habitual residence, unless the child 'consistently splits time more or less evenly between two locations, so as to retain alternating habitual residences in each.'" *Id.* at 1177 (quoting *Mozes*, 239 F.3d at 1075 n.17). In *Valenzuela*, the children split their time evenly between their mother in Mexico and their father in the United States. The Ninth Circuit categorized the case as a "shuttle custody" case—a case where the child spends half of her time in one country with one parent and the other half of her time in another country with the other parent. Nonetheless, the Ninth Circuit *held* that the district court did not err in deciding that both parents shared a settled intention to abandon Mexico based on their immediate plans to seek government assistance for the children in the United States and their longer-term plans to educate the children in the United States. *Id.* at 1179. The Ninth Circuit did suggest that the father also *could have* prevailed by showing that both parents shared an intention to abandon Mexico as the children's "*sole* habitual residence." *Id.*

Even if the Eleventh Circuit were to adopt an "alternating habitual residence" rule, it would not apply under the facts of this case, where the Children spent most of their time in Italy and only spent summers in the United States. Furthermore, the evidence in this case is that the children's habitual residence *on the date of removal*, March 23, 2018, was Italy. Castillo's

argument that this case is a "shuttle custody" case where the children were "retained" rather than "removed" is unavailing. The cases she relies on in support of this argument—*Valenzuela* and two cases discussed in *Valenzuela*—are all shuttle custody cases where the children split their time evenly between one parent in one country and the other parent in another country. In all three cases, the courts concluded that the children were habitual residents of each country where they split their time. So, when the children were *retained* in one country after they were supposed to be returned to another, the courts found that the proper habitual residence for purposes of an action under the Convention was the country where the child was physically present on the date of the *retention* and that the custody issue should be decided there. This conclusion makes sense in light of the Convention's statement that removal or retention is wrongful if it is a breach of custody rights "under the law of the State in which the child was habitually resident immediately before the removal or retention." Convention art. 3. In the shuttle custody cases, the children were considered habitual residents of the countries where they were retained. But these cases do not address *removal* from one habitual residence country to another. So, even if the Court were to find that this is a "shuttle custody" case and that the Children had alternating habitual residences, the fact remains that the Children were

19

*removed* from Italy during a time of the year when they had been habitual residents of Italy, not the United States.

In summary, the Court concludes that the State of habitual residence for R.T.D.L. and N.A.D.L. immediately before the removal was Italy.

B.  Did Castillo's Removal of the Children Violate De Lucia's Custody Rights Under Italian Law?

Castillo does not dispute that De Lucia had custody rights under Italian law or that her removal of the Children violated those rights.  Under Italian Civil Code Article 316, "[b]oth parents are entitled with parental responsibility and they shall exercise it by mutual agreement."  Pet'r's Hr'g Ex. 2, ECF No. 31-1 at 26.[3]  "Parents shall decide their child's habitual residence by mutual agreement."  *Id.*  "When both parents have recognized a child who was born out of wedlock, they shall be both entitled to exercise parental responsibility."  *Id.*  Carlo Rimini, an Italian lawyer and university professor who specializes in family law, testified at the hearing that under Article 316, both parents have the right to decide on the children's residence, even if the parents are not married.  To change a child's habitual residence, both parents must agree on

---

[3] Federal Rule of Civil Procedure 44.1 governs the Court's review of questions of foreign law.  As required by that Rule, De Lucia gave written notice of his intent to rely on Italian law.  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law."  Fed. R. Civ. P. 44.1.

the change or convince a judge to grant one parent sole authority to make this decision.

Castillo, however, argues that the Court should consider the custody laws of Georgia—not Italy—because the Children now reside here. Under Georgia law, "[o]nly the mother of a child born out of wedlock is entitled to custody of the child, unless the father legitimates the child." O.C.G.A. § 19-7-25. But as discussed above, the habitual residence of the children on March 23, 2018 was Italy, not the United States. Therefore, the Court looks to Italian law to determine whether De Lucia had custody rights. *See* Convention art. 3 (explaining that removal is considered wrongful where "it is in breach of the rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal"). As discussed above, De Lucia established, and Castillo does not dispute, that De Lucia had custody rights under Italian law, that he was exercising those rights at the time of the removal, and that Castillo's removal of the children to the United States violated De Lucia's custody rights.

Because the Children's State of habitual residence on March 23, 2018 was Italy and Castillo's removal of the Children violated De Lucia's custody rights, the Court finds that Castillo "wrongfully removed" the Children from Italy.

**II. Would Returning the Children to Italy Expose Them to a Grave Risk of Physical or Psychological Harm or Place Them in an Intolerable Situation?**

Castillo argues that even if the Children were wrongfully removed from Italy, one of the Convention's narrow exceptions to return applies. Under the Convention, the Court is not bound to order the return of the Children if Castillo proves that "there is a grave risk that [the Children's] return would expose the[m] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." Convention art. 13. "In considering the circumstances referred to in . . . Article [13], the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence." *Id.* Castillo has the burden to establish this exception "by clear and convincing evidence." 22 U.S.C. § 9003(e)(1)(2)(A). Castillo "must 'show that the risk to the child[ren] is grave, not merely serious.'" *Gomez v. Fuenmayor*, 812 F.3d 1005, 1012 (11th Cir. 2016) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, 10510 (1986)). "In this Circuit, the district court is not required to also find that the home country is unable to protect the child from that grave risk of harm." *Id.*

A "child's proximity to actual or threatened violence may pose a grave risk to the child." *Id.* at 1013. In *Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008), for example, clear and convincing evidence supported the conclusion that a child would face a grave risk of harm if he were returned to his father in Australia because the father had often been violent toward the child's mother in the child's presence, had endangered the child's safety, and was unable to care properly for the child (or himself) due to an injury and due to his prolific alcohol abuse. *Id.* at 1342, 1352. In *Gomez*, clear and convincing evidence supported a determination that a child "would face a grave risk of harm if she were to be returned to [her mother in] Venezuela" because although the child had not been harmed in the past, her mother and stepfather had made repeated threats against the child's father and it was "highly probable" that they were behind a number of incidents, including the shooting of the father's girlfriend moments after the child had been with her in a car, vandalism of the paternal grandmother's car, and drugs being planted in the paternal grandmother's car. *Gomez*, 812 F.3d at 1013, 1015. And in *Taylor v. Taylor*, 502 F. App'x 854 (11th Cir. 2012) (per curiam), the Eleventh Circuit found that the district court did not err in concluding that a child would face a great risk of harm if she were returned to her father in the United Kingdom because the father made threats of

physical violence against the mother and the mother received anonymous death threats from the father's "creditors." *Id.* at 855, 857.

In contrast, in *Seaman v. Peterson*, 766 F.3d 1252 (11th Cir. 2014) the father seeking to prevent his children's return to Mexico alleged that the mother was a member of a religious group whose practices were harmful to children and that the children were neglected and malnourished while in their mother's care. *Id.* at 1256. But the *evidence* established that the mother had disavowed her allegiance to the religious group, and there was no *evidence* that the children had been neglected or abused. *Id.* at 1260. Therefore, it was not error for the district court to conclude that there was no grave risk of harm.

Here, Castillo argues that the Children face a grave risk of harm if they are returned to Italy because she has been the victim of domestic violence at the hands of De Lucia; because De Lucia has been sexually inappropriate with the Children; and because the Children will be separated from their primary caretaker if the Children are returned to De Lucia.

Castillo presented evidence that De Lucia has a bad temper and has engaged in violent behavior directed at her. But, the record also establishes that the physical violence was isolated, sporadic, and not directed to the Children. Castillo did not testify about any incidents of violence against the Children,

and she did not present evidence that she reported any such incidents to the police. And, according to Castillo, De Lucia did not commit any acts of physical violence against her after he moved out of her apartment in December 2016. Castillo also presented evidence that De Lucia often yelled at her, berated her, and threatened her, although her testimony suggests that these incidents were less frequent after the separation, and she did not present any other evidence to establish otherwise. While the Court has concerns about De Lucia's violent outbursts, the Court finds that they do not justify the drastic step of declining return of the Children. The Court observes that although Castillo asked the Italian court to grant her exclusive custody of the Children, she also asked the Italian court to grant De Lucia visitation for alternating weekends and certain weekdays. She made this request after she moved to the United States. In addition, Castillo invited De Lucia to come see the Children in Athens at least twice. This evidence suggests that Castillo herself does not believe that De Lucia poses a grave risk of harm to the Children. And, the parties agreed that the Children would live with their paternal grandparents (and De Lucia) if returned to Italy and that it would be a loving environment. For all of these reasons, to the extent that Castillo argues that De Lucia poses a grave risk of harm to the Children based on his temper and his past domestic violence

against her, the Court is not persuaded that Castillo proved by clear and convincing evidence De Lucia poses a grave risk of harm to the Children.

Castillo also contends that De Lucia engaged in inappropriate behavior of a sexual nature with the Children. She points to two photos of the Children without clothes, as well as evidence of the "game of the father." The two photos of the Children are inconclusive; the Court doubts that De Lucia would have sent the photos to Castillo if he were engaging in sexual behavior with the Children or if he thought the photos were inappropriate. Furthermore, Castillo did not, at the time, suggest to De Lucia that the photos were inappropriate. And, although it is disturbing that a child would engage in exhibitionist gestures during a bath and attribute them to a "game of the father," the Court does not find that this evidence establishes by clear and convincing evidence a grave risk of harm to the Children. Certainly, sexual abuse by a parent, if proved, would be an intolerable situation that poses a grave risk of psychological harm. But here, Castillo did not present evidence that De Lucia sexually abused either of the Children. The Court also observes that Italy is capable of protecting the Children if they are subjected to serious threats of harm.

Finally, Castillo argues that the Children would be placed in an intolerable situation if they were returned to Italy

because they would be cut off from their mother, at least until the Italian court can adjudicate the custody dispute (unless the parties can reach an interim visitation agreement). In every case where a child is returned under the Convention, she may face a risk of psychological harm by being cut off from one parent while the custody dispute is adjudicated. Castillo did not point the Court to any precedent suggesting that this concern merits application of the narrow grave risk of harm exception. Rather, the "intolerable situation" exception has only been applied in a handful of circumstances. First, it has been applied when "the courts of the child's country of habitual residence are unable to make decisions regarding custody rights" and protect the child. *Pliego v. Hayes*, 843 F.3d 226, 233 (6th Cir. 2016) (examining the meaning of "intolerable situation"). Second, it has been applied where the child's country of habitual residence does not have adequate treatment facilities for a child with a serious medical condition. *Ermini v. Vittori*, 758 F.3d 153, 167 (2d Cir. 2014) (concluding that an autistic child faced a grave risk of harm if he were returned to Italy because there were no adequate treatment facilities there). Third, it would likely be applied if the child would be returned "to a zone of war, famine, or disease." *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996). Finally, the State Department has stated that sexual abuse by a custodial

parent is an example of an intolerable situation. Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, 10,510 (Mar. 26, 1986).

Here, Castillo did not present evidence of sexual abuse, this case does not involve a child with a serious medical condition, and the Children would not be returned to a zone of war, famine, or disease. There is no evidence that the Italian courts are unable or unwilling to make a custody determination or protect the Children. Rather, the evidence presented at the hearing establishes that a custody proceeding is already open in Italy, that a hearing is scheduled, that officials are prepared to investigate Castillo's allegations against De Lucia, and that social services agencies have provided and will continue to provide both De Lucia and Castillo with parenting support. The Court is satisfied that the Italian court can take appropriate actions to protect the children. If the Italian court finds that De Lucia is a threat to the Children and that it would not be in the Children's best interest for him to have custody of them, there is a procedure under which the Italian court can award Castillo sole custody.

In summary, the Court concludes that Castillo did not prove by clear and convincing evidence that the grave risk of harm exception to return applies here.

**III. Should the Court Impose Conditions on the Children's Return to Italy?**

Castillo argues that if the Court orders return of the Children, the Court should take measures to lessen the risk of harm to the Children. She asks that De Lucia be required to enter a binding agreement giving her parenting time pending a final custody decision; that De Lucia drop the kidnapping charges against her; and that De Lucia enroll in psychological support and parenting support programs before the Children are returned. The case Castillo cites in support of this argument, *Blondin v. Dubois*, 238 F.3d 153 (2d Cir. 2001), noted in dicta in a footnote that some courts use "undertakings" to alleviate dangers that might otherwise justify denial of a petition for return. *Id.* at 160 n.8.[4] Here, however, the Court finds no grave risks that would justify denial of De Lucia's petition.

The Eleventh Circuit has suggested that although the district court may not delegate the grave risk of harm inquiry to a foreign court, any concerns about "potential risks that are less than grave but bear watching" can be handled by the court deciding custody issues. *Seaman*, 766 F.3d at 1262. As discussed above, the Italian courts and social services system

---

[4] The *Blondin* court did not reach a holding on undertakings; rather, it held that the district court correctly denied the father's petition for return because the children suffered severe traumatic stress disorder based on their father's sustained abusive behavior and would thus face a grave risk of psychological harm if they were repatriated to their father's country.

are capable of deciding the custody dispute and protecting the Children. While the Court declines to order any of the "undertakings" Castillo seeks, the parties are certainly encouraged to try to work out an interim custody arrangement and seek psychological and parenting support.

## IV. Should the Court Order Castillo to Pay Petitioner's Fees and Expenses?

De Lucia asked that Castillo be required to pay his fees and expenses. ICARA provides: "Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 22 U.S.C. § 9007(b)(3). The Eleventh Circuit has suggested that there are two circumstances under which an award under § 9007(b)(3) is "clearly inappropriate." The first is when "a fee award would impose such a financial hardship that it would significantly impair the respondent's ability to care for the child." *Rath v. Marcoski*, 898 F.3d 1306, 1311 (11th Cir. 2018). The second is when "a respondent had a good faith belief that her actions in removing or retaining a child were legal or justified." *Id.*

In this case, De Lucia is proceeding *in forma pauperis*, so he paid no court fees. De Lucia is represented by pro bono counsel, so he owes no fees or expenses to his lawyers. Although the Court recognizes that counsel's pro bono status does not make an award of attorney's fees clearly inappropriate, the Court declines to make such an award in this case. In his application for leave to proceed *in forma pauperis* that his attorney filed with the Court, De Lucia represented that he contributes $500 per month toward the Children's support. Based in part on this representation, the Court concluded that De Lucia was unable to pay the filing fee. But, at the hearing, it was clear that De Lucia had not paid any child support for months before he filed his petition. These circumstances cut against an award of attorney's fees in this case. Moreover, although the Court did not hear evidence on the fee issue during the hearing, the Court is satisfied based on Castillo's representation in her trial brief that Castillo has limited means, making $12.22 per hour as a warehouse worker to support her three children. Paying the fees and expenses of De Lucia's pro bono attorneys would significantly impair Castillo's ability to care for her children, so the Court declines to award attorney's fees and expenses.

The Court, however, finds that Castillo should be required to help pay for the Children to return to Italy. Accordingly,

the Court orders Castillo to pay for the cost of the airline tickets for the Children to return to Italy. The Court recognizes that airline tickets between the United States and Italy are expensive and that the cost will be significant to Castillo because of her limited means, but the Court finds that she should bear this cost of returning the Children, whom she wrongfully removed, to Italy.

ORDER OF RETURN

For the reasons set forth above, the Court GRANTS De Lucia's petition for return. Unless the parties agree on a later time, Castillo shall deliver the Children to De Lucia before June 7, 2019 at an agreed upon location in Athens, Georgia, having assured that the Children have all travel documents necessary to return to Italy. The Clerk of the Court may release the Children's passports to De Lucia.[5]

IT IS SO ORDERED, this 29th day of April, 2019.

S/Clay D. Land
_____
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[5] As with most child custody disputes, a sense of sadness permeates these proceedings. But there is one positive light shining dimly through the darkness. The legal advocacy in this action represents the best of our profession. De Lucia's counsel provided professional and exceptional representation pro bono out of a sense of duty without any expectation of monetary compensation. Castillo's counsel and the University of Georgia School of Law's Family Justice Clinic unhesitatingly accepted the Court's pro bono appointment, likewise providing outstanding representation. The superb, zealous, and unselfish representation on both sides benefitted the parties and the Court. And the Court finds it deserves public commendation.